UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MELINDA BRILLINGER                                    CIVIL ACTION

VERSUS                                               NO. 14-1540

CAROLYN W. COLVIN, ACTING                            SECTION "G" (2)
COMMISSIONER OF SOCIAL SECURITY

## FINDINGS AND RECOMMENDATION

Plaintiff, Melinda Brillinger, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under Titles II and XVI of the Act. 42 U.S.C. §§ 423, 1382c. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(B).

I.      PROCEDURAL HISTORY

Brillinger filed her applications for DIB and SSI on February 14, 2012, alleging disability beginning January 21, 2012, due to severe migraines, skin disorder, anxiety and fibromyalgia. (Tr. 138, 145, 166). After her claims were denied at the agency level, she requested a hearing before an Administrative Law Judge (ALJ), which was held on February 6, 2013. (Tr. 30-66). The ALJ issued a decision denying the applications on March 20, 2013. (Tr. 17-25). Brillinger asked the ALJ for reconsideration because it appeared that he had not considered Exhibit B14F (medical reports dated February 27,

2013) in his decision.  On April 29, 2013, the ALJ issued an amended decision that reconsidered his prior decision in light of Exhibit B14F, but again denied plaintiff's applications for benefits.  (Tr. 11-12).  After the Appeals Council denied review on May 6, 2014, the ALJ's amended decision became the Commissioner's final decision for purposes of this court's review.  (Tr. 1-5).

Brillinger states in her memorandum in this court that she amended her alleged onset date at the hearing to January 13, 2012.  However, both of the ALJ's decisions say that the date was January 21, 2012, the date alleged in plaintiff's applications.  (Tr. 138, 145).  The administrative record indicates that Brillinger filed a previous DIB application that was denied on January 20, 2012, after a hearing.  (Tr. 162).  If the prior application had alleged the same type of disabling impairments as plaintiff's new applications, the Commissioner could insist that January 21, 2012, the day after the denial, was the new alleged onset date, because an award of benefits for a period of disability for which a previous application has been denied and the decision has become final is ordinarily barred by res judicata.  42 U.S.C. § 405(h); Hillman v. Barnhart, 170 F. App'x 909, 911 n.8 (5th Cir. 2006); Asbury v. Comm'r of Soc. Sec., 83 F. App'x 682, 686 (6th Cir. 2003); Thomas v. Shalala, 66 F.3d 323, 1995 WL 534943, at *1 (5th Cir. 1995); Muse v. Sullivan, 925 F.2d 785, 787 n.1 (5th Cir. 1991).

Brillinger filed a timely memorandum in support of her appeal.  Record Doc. No. 14.  Defendant filed a timely reply memorandum.  Record Doc. No. 16.

2

II.    <u>STATEMENT OF ISSUE ON APPEAL</u>

Brillinger contends that the ALJ erred by finding plaintiff's allegations regarding

her need to lie down frequently during the day not credible.

III.   <u>ALJ'S FINDINGS RELEVANT TO ISSUE ON APPEAL</u>

1.    Plaintiff has severe impairments consisting of degenerative disc disease of
      the lumbar spine, fibromyalgia and obesity.

2.    She has the residual functional capacity to perform sedentary work, except
      that she can sit for up to 20 minutes at a time and then has to be able to
      change positions in her seat or stand for up to a minute; and she can stand
      for up to 15 minutes at a time and then has to be able to sit.

3.    Although Brillinger's medically determinable impairments could
      reasonably be expected to cause the alleged symptoms, her statements
      concerning the intensity, persistence and limiting effects of these symptoms
      are not entirely credible.

4.    She cannot perform her past relevant work as an advertising sales
      representative and a trainer.

5.    Plaintiff was 37 years old on the alleged disability onset date and has at
      least a high school education.

6.    Considering her age, education, work experience and residual functional
      capacity, there are jobs that exist in significant numbers in the national
      economy that she can perform, including telemarketer, customer service
      representative and information clerk.

7.    Brillinger has not been under a disability from January 21, 2012 through
      the date of the ALJ's decision.

(Tr. 19-20, 23-25).

8.    Upon reconsideration, the ALJ stated that he had failed to consider
      Exhibit B14F (Tr. 390-402) in his original decision, but he found nothing

3

in the complete record to justify Brillinger's allegation that she needs to recline with her feet elevated for six to seven hours per day.

9.      Although the ALJ found that Exhibit B14F corroborates some of plaintiff's allegations, he explained that he had already accounted for her allegations regarding her difficulties with sitting, standing, lifting and carrying in his hypothetical to the vocational expert, which he had adopted as plaintiff's residual functional capacity.

10.     The ALJ's former decision remains in full force and effect.

(Tr. 12).

IV.    ANALYSIS

    A.      Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Richard ex rel. Z.N.F. v. Astrue, 480 F. App'x 773, 776 (5th Cir. 2012) (citing Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005)); Stringer v. Astrue, 465 F. App'x 361, 363 (5th Cir. 2012) (citing Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002)).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Richard ex rel. Z.N.F., 480 F. App'x at 776; Stringer, 465 F. App'x at 363-64; Perez, 415 F.3d at 461.  This court may not reweigh the evidence in the record,

try the issues <u>de novo</u> or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision. <u>Halterman ex rel. Halterman v. Colvin</u>, No. 12-31099, 2013 WL 5913945, at \*2 (5th Cir. May 9, 2013) (citing <u>Newton v. Apfel</u>, 209 F.3d 448, 452 (5th Cir. 2000)); <u>Stringer</u>, 465 F. App'x at 364. The Commissioner, rather than the courts, must resolve conflicts in the evidence. <u>Luckey v. Astrue</u>, 458 F. App'x 322, 324 (5th Cir. 2011) (citing <u>Selders v. Sullivan</u>, 914 F.2d 614, 617 (5th Cir. 1990)); <u>Newton</u>, 209 F.3d at 452.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. <u>See</u> <u>Arkansas v. Oklahoma</u>, 503 U.S. 91 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it. <u>Joubert v. Astrue</u>, 287 F. App'x 380, 382 (5th Cir. 2008) (citing <u>Perez</u>, 415 F.3d at 461). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. <u>Ray v. Barnhart</u>, 163 F. App'x 308, 311 (5th Cir. 2006) (citing <u>Perales</u>, 402 U.S. at 390); <u>Perez</u>, 415 F.3d at 461.

To be considered disabled and eligible for SSI or DIB,[1] plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically

---

[1]The relevant law and regulations governing claims for DIB and SSI are identical. <u>Carmon v. Barnhart</u>, 81 F. App'x 410, 411 n.1 (3d Cir. 2003) (citing <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994)); <u>Baltierra v. Chater</u>, 70 F.3d 1268, 1995 WL 696740, at \*1 (5th Cir. Oct. 19, 1995) (citing <u>Haywood v. Sullivan</u>, 888 F.2d 1463, 1467 (5th Cir. 1989)); <u>Bryan v. Halter</u>, 252 F.3d 1357, 2001 WL 422878, at \*1 (5th Cir. Apr. 5, 2001) (citing <u>Haywood</u>, 888 F.2d at 1467).

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations

that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§

404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2012).  The regulations

include a five-step evaluation process for determining whether an impairment prevents

a person from engaging in any substantial gainful activity.[2]  Id. §§ 404.1520, 416.920;

Alexander v. Astrue, 412 F.  App'x 719, 720 (5th Cir. 2011) (citing Audler v. Astrue,

501 F.3d 446, 447 (5th Cir. 2007)); Perez, 415 F.3d at 461.  The five-step inquiry

---

[2]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

terminates if the Commissioner finds at any step that the claimant is or is not disabled. Id.

The claimant has the burden of proof under the first four parts of the inquiry. If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing. When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding. Alexander, 412 F. App'x 720-21; Perez, 415 F.3d at 461.

The court weighs four elements of proof when determining whether there is substantial evidence of disability: "'(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.'" Chrisner v. Astrue, 249 F. App'x 354, 356 (5th Cir. 2007) (quoting Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)); accord Perez, 415 F.3d at 463.

B.    Factual Background

Brillinger testified that she is 38 years old and lives in a mobile home in Franklinton, Louisiana, with her husband and two children, ages 13 and 7. She stated that her husband works. She said she finished high school, attended one year of college and last worked as a client services supervisor for one year until April 2007. She testified that she was laid off from that job. (Tr. 37-38).

7

Plaintiff stated that she cannot work because she cannot sit or stand for long periods of time.  She testified that, in either event, she has a burning sensation from her hips to her knees, which becomes a weakness, so that she feels she cannot hold herself up.  She said she is so fatigued after standing for a few moments that she has to recline with her feet elevated.  Brillinger stated that a sharp pain shoots across her back and down her legs if she bends over.  She testified that, after driving to the hearing, she felt extremely uncomfortable, her legs felt very heavy and it was difficult to walk.  (Tr. 38).

Brillinger testified that she is 5'8" tall and weighs approximately 270 pounds.  She said her weight has fluctuated about 20 pounds in the past year.

Plaintiff stated that, on a typical day, she gets up in the morning to help her children get ready for school.  She said that her older child makes breakfast for the two children.  (Tr. 39-40).  She testified that she can only cook a meal by using a crockpot because she cannot stand long enough to cook anything that requires standing in the kitchen.  She said she buys pre-cut vegetables and has tried sitting to cut vegetables, but cannot sit long enough to do it.  She said she must stand after sitting for a few minutes.

Brillinger testified that she does not wash dishes because she cannot bend over to put them in the dishwasher and cannot wash dishes by hand because she tires too easily and her back would be too painful.  She explained that moving from side to side to put dishes in the drainer could send a sharp pain down her leg.  (Tr. 40-41).  She stated that she does not do any household chores and often pays her sister to clean the bathrooms.

Brillinger said she prefers not to drive and will only drive on her own about five miles, which is the distance to the grocery store.  However, she stated that she cannot shop without assistance and usually brings her husband or son with her to pick up items from the lower shelves or lift anything heavy.  She testified that she has to lean on the shopping cart for support and that occasionally she must sit down because she cannot make it through the entire store without resting.  (Tr. 41).

Plaintiff stated that she can sit for 15 to 20 minutes at a time before she must stand and change positions, and can stand for 10 to 15 minutes if she has something on which to lean or for 5 to 10 minutes without support.  She estimated that she can walk for 20 yards and can lift and carry the weight of a gallon of milk or a 5-pound bag of sugar.  (Tr. 42-43).  She said she needs a railing to climb stairs and is very slow when climbing them.

Brillinger confirmed the notation in her medical records that she had a positive ANA test,[3] but did not meet the criteria for lupus.  She said her doctors have not found a cause for the ANA results, but have diagnosed her with fibromyalgia with a positive ANA.  (Tr. 43).

The ALJ asked plaintiff about the notations in at least two places in her medical records that she had normal range of motion in her back upon physical examinations, and

---

[3]ANA is an abbreviation for antinuclear antibodies, which are "antibodies directed against nuclear [i.e., the nucleus of a cell] antigens; ANA against a variety of different antigens are almost invariably found in systemic lupus erythematosus and are frequently found in rheumatoid arthritis, scleroderma . . .  and mixed connective tissue disease."  Dorland's Illustrated Medical Dictionary 284 (29th ed. 2000) (hereinafter "Dorland's") at 70, 99.

9

that the agency's consultative examiner, Dr. Catherine DiGiorgio, noted that Brillinger

had full range of motion in her neck, back and all joints with normal walking, standing

and use of hands.  Plaintiff explained that she has difficulty verbalizing how much pain

she is having when she visits a doctor.  (Tr. 44).  She said she has a tendency to try to

please people and will do things that would ordinarily cause her pain.  (Tr. 44-45).  She

stated that the doctor's notes would not reflect that, even though she had full range of

motion while doing exercises at the office, she would have suffered for it that evening.

Plaintiff confirmed that she told Dr. DiGiorgio she had a two-year history of

migraine headaches, but took no medication for it.  She said her treating physicians think

the migraines are related to her blood pressure, which is being treated.  She testified that

she recently went to an urgent care clinic for her back and that the clinic would not treat

her because her pulse and blood pressure were high, so she was sent to the emergency

room to address those issues.  (Tr. 45-46).  However, she stated that she was sent home

from the emergency room without treatment because her pressure was only slightly high.

Brillinger said she takes regular medications to reduce her pulse and blood

pressure.  She testified that she takes non-insulin medication for diabetes and has been

taking 50 mg. of tramadol[4] three times a day for pain for at least one and one-half years.

(Tr. 46).  When the ALJ noted that plaintiff's medical records from April 2012 state that

---

[4]Ultram (generic name: tramadol) "is an opioid analgesic (pain killer) that is used in the management of moderate to moderately severe pain" in adults.  PDRhealth (PDR Network, LLC), http://www.pdrhealth.com/drugs/ultram (visited Feb. 20, 2015).

she was not on any pain medication, she testified that her internist, Dr. Glynn Hebert,[5] had prescribed tramadol as needed and that she has taken it daily only in the last eight months (or since about June 2012).  (Tr. 46-47).  She stated that her rheumatologist, Dr. Marielisa Sedrish,[6] had prescribed Cymbalta,[7] but the drug was discontinued because it caused liver and stomach problems.  Plaintiff said that, before tramadol, she tried another prescription pain medication, but it affected her stomach ulcer.  She testified that tramadol was prescribed around August or September 2012, when she complained to Dr. Hebert of her worsening back symptoms.

Brillinger stated that she does not receive any mental health care.  (Tr. 47).  The ALJ observed that he found no medical record evidence of anxiety, although plaintiff had mentioned anxiety on her application for disability benefits.  She said she was depressed around that time, but is not seeking any medication for depression.  She said that Cymbalta was prescribed for anxiety because she has a pounding pulse sensation.

Brillinger testified that, in addition to taking medication, she tries to manage her pain with hot baths, an ice pack on her lower back on bad days and sitting with her feet or legs reclined.  (Tr. 48).  She stated that she spends seven to eight hours on average

---

[5]Mis-transcribed as "Abair" in the hearing transcript.

[6]Mis-transcribed as "Sevrish" in the transcript.

[7]Cymbalta (generic name: duloxetine) is used to treat major depressive disorder, generalized anxiety disorder, pain from diabetic peripheral neuropathy, fibromyalgia, long-term osteoarthritis and low back pain.  PDRhealth, http://www.pdrhealth.com/drugs/cymbalta (visited Feb. 20, 2015).

either reclining or lying down because she cannot walk, stand or sit for long without her legs becoming stiff or heavy. (Tr. 48-49). She said her back pain would be worse if she did not lie down so much. Plaintiff explained that the pain radiates through her hips and legs, her toes fall asleep and she becomes too emotional and frustrated to deal with her children or anyone. She stated that she can alternate between sitting and standing for only a couple of hours before she has to elevate her feet. She said she felt exhausted at the hearing, her legs felt heavy, her hips felt weak and she could not wait to put her feet up, by which she meant either lying back in a recliner or flat on her back. (Tr. 49).

When her attorney asked if plaintiff recalled an emergency room visit in January 2012, she stated that she had been managing her back pain before then and thought she had pulled a muscle or done something to aggravate her back because the pain was magnified significantly all of a sudden. She said she went to the emergency room because Dr. Hebert was unable to see her when she called him that day.

Brillinger testified that she went to the urgent care clinic for her back recently because she has been trying to see a neurosurgeon at LSU Medical Center and thought that she might have a better chance of getting there if she went through an urgent care clinic. She stated that her back pain is worsening. (Tr. 50). She said she is willing to consider surgery to get some relief.

Plaintiff testified that Dr. Hebert referred her to LSU's neurosurgery clinic in New Orleans after he received her MRI results and told her that she would hear from the clinic

12

about an appointment, but she has not heard.  She said she called LSU twice and confirmed that they have the referral, but was told they cannot schedule her yet because of their caseload.  She said she called other neurosurgeons in the area herself, but none can do more than a consultation because she lacks insurance.  She stated that her husband is self-employed and does not qualify for a group insurance plan, and that she was denied coverage when they tried to get primary insurance.  (Tr. 51-52).

Brillinger said that, when she saw LSU rheumatologist Dr. Sedrish in April 2012, she mentioned her back pain and Dr. Sedrish ordered an MRI of her pelvis, which found nothing.  She could not understand why Dr. Sedrish had not ordered a lumbar MRI.  She testified that Dr. Hebert, the internist, focuses on treating her diabetes and high blood pressure, but his only method of treating her back pain has been to send her for a referral.  The ALJ noted that the only record of treatment for back problems in September 2012 was an MRI of plaintiff's back.  (Tr. 52).  Brillinger stated that she has a follow-up appointment with Dr. Hebert the month after the hearing, but was still waiting for the neurosurgery referral appointment.

Plaintiff testified that she could not alternate sitting and standing on a consistent basis and that she has to elevate her legs because they tend to fall asleep and feel heavy.  She said elevating them relieves the pressure and allows her to move her legs.  She stated that she could not just prop her legs on a footstool because she also needs to relieve the pressure on her back by reclining.  She testified that no doctor told her to do that, but she

13

has found that it works for her.  She said Dr. Hebert has not given her any restrictions except to maintain her blood pressure, follow a diabetic diet and not do something if doing it hurts.  (Tr. 53-54).

C.     Vocational Expert Testimony

A vocational expert, Katherine Prieur,[8] testified at the hearing that plaintiff's work as an advertising sales representative and a trainer are both skilled, light duty jobs. (Tr. 59-60).  The ALJ posed a hypothetical of a person with plaintiff's age, education and work experience who can do sedentary work, meaning that she can lift up to ten pounds occasionally, stand/walk for about two hours and sit for six hours in an eight-hour day with normal breaks, except that she can only sit for up to 20 minutes at a time and then has to be able to stand or change positions for up to a minute, and can stand for up to 15 minutes at a time and then has to be able to sit.  (Tr. 61).  Prieur testified that such an individual could not perform Brillinger's past relevant jobs because they were light duty.

Prieur stated that plaintiff had transferable customer-service-type skills, such as computer skills, customer or "people" skills, sales and training skills, that would permit her to work as a telemarketer, customer service representative or information clerk, which are all sedentary, semi-skilled jobs that are available in significant numbers in the Louisiana and national economies.  (Tr. 62-63).

---

[8]This is the correct spelling of Prieur's name, according to her resumé (Tr. 131), not Catherine Pryor, as the hearing transcript states.

14

The ALJ modified the hypothetical to add a limitation that the person had to spend seven to eight hours per day in a recliner.  The vocational expert testified that such a person could not perform any job.  (Tr. 64).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence in his original and amended decisions.  (Tr. 11, 20, 22-23).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Substantial Evidence Supports the ALJ's Credibility Determination

Brillinger argues that she needs to lie down for seven to eight hours during the day because of her severe lower back pain with radiation primarily into her left leg.  The ALJ found that her statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible.  Brillinger argues that the ALJ's reasons for finding her not credible are not supported by substantial evidence.

Specifically, the ALJ noted in his original decision that the medical evidence was inconsistent with the level of Brillinger's alleged pain and that her credibility was undermined by the evidence of infrequent and conservative medical treatment, the lack of objective studies to correlate clinically with the alleged heaviness and reduced strength in her legs, her essentially normal physical examinations in March and September 2012, the lack of medication for fibromyalgia and the lack of any physician's restriction to lie

15

down with her feet elevated for six to seven hours.  In his amended decision, the ALJ reconsidered the record with Exhibit B14F, but still found nothing to justify plaintiff's allegation.  He again discounted the credibility of her alleged need to lie down all day because of her "virtually normal" physical examinations in March and April 2012, her testimony that she had been taking medication "as needed" and had been inconsistent in her medical compliance, and the lack of any physician's opinion that she needed to lie down as often as she did.

"While pain can be disabling, it is not an automatic ground for entitlement to disability benefits.  Pain is recognized as a disabling condition under the Act only where it is constant, unremitting, and wholly unresponsive to therapeutic treatment.  The test for disability under the Act is not satisfied merely because Plaintiff cannot work without some pain or discomfort."  Alvarez v. Colvin, No. 3:12-CV-03569-BK, 2013 WL 1858197, at *7 (N.D. Tex. May 3, 2013) (citing Hames v. Heckler, 707 F.2d 162, 166 (5th Cir. 1983)); accord Nugent v. Astrue, 278 F. App'x 423, 427 (5th Cir. 2008) (citing Cook v. Heckler, 750 F.2d 391, 395 (5th Cir. 1985)); Beck v. Barnhart, 205 F. App'x 207, 212 (5th Cir. 2006) (citing Cook, 750 F.2d at 395); Selders, 914 F.2d at 618.

It is within the ALJ's discretion to determine the disabling nature of a claimant's pain, and the ALJ's determination is entitled to considerable deference.  Jenkins v. Astrue, 250 F. App'x 645, 647 (5th Cir. 2007) (citing Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001)).  Whether a claimant is able to work despite some pain is within

16

the province of the ALJ, and the determination should be upheld if supported by substantial evidence.  Id. (citing Chambliss, 269 F.3d at 522; Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994)).

The ALJ acknowledged that, since the alleged onset date of January 21, 2012, plaintiff has severe physical impairments consisting of degenerative disc disease of the lumbar spine, fibromyalgia and obesity.  However, "'[t]he mere presence of some impairment is not disabling per se.  Plaintiff must show that [she] was so functionally impaired [by her diagnosed impairment] that she was precluded from engaging in any substantial gainful activity.'"  Bordelon v. Astrue, 281 F. App'x 418, 422 (5th Cir. 2008) (quoting Hames, 707 F.2d at 165) (emphasis added); accord Randall v. Astrue, 570 F.3d 651, 658-59 (5th Cir. 2009); Anthony v. Sullivan, 954 F.2d 289, 293 (5th Cir. 1992).

Subjective complaints of pain or other symptoms must be corroborated by objective medical evidence.  Quijas v. Astrue, 298 F. App'x 391, 393 (5th Cir. 2008) (citing Chambliss , 269 F.3d at 522).  Subjective complaints may be discounted when the alleged symptoms are not consistent with the objective evidence.  Brown v. Astrue, 344 F. App'x 16, 21 (5th Cir. 2009); Hernandez v. Astrue, 278 F. App'x 333, 340 (5th Cir. 2008); Dunbar v. Barnhart, 330 F.3d 670, 672 (5th Cir. 2003).

Determining the credibility of plaintiff's subjective evidence of pain and disability is a necessary part of the ALJ's consideration of the evidence.  Luckey, 458 F. App'x at 326 (citing Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); Perez, 415 F.3d at 462.

The ALJ is bound to explain his reasons for rejecting a claimant's subjective complaints, but "is not required to 'follow formalistic rules in his articulation.'" Hernandez, 278 F. App'x at 339 (quoting Falco, 27 F.3d at 164). The ALJ has the responsibility to evaluate the credibility of witnesses, Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002), and "credibility conclusions are 'precisely the kinds of determinations that the ALJ is best positioned to make.'" Spruill v. Astrue, 299 F. App'x 356, 358 (5th Cir. 2008) (quoting Falco, 27 F.3d at 164). Thus, the ALJ's credibility evaluation is entitled to "great deference" by this court. McKnight v. Astrue, 340 F. App'x 176, 181 (5th Cir. 2009) (emphasis added) (citing Newton, 209 F.3d at 459); Spruill, 299 F. App'x at 358 (citing Newton, 209 F.3d at 459). The ALJ is required only to review the entire record, resolve conflicts in the evidence and state specific reasons for his credibility findings, supported by the evidence. Luckey, 458 F. App'x at 324; Giles v. Astrue, 433 F. App'x 241, 249 (5th Cir. 2011).

The ALJ explained in both of his decisions why he found that plaintiff's subjective symptoms and alleged limitations were inconsistent with the evidence as a whole, which he considered. (Tr. 12, 23). He incorporated into his residual functional capacity assessment all the functional limitations that he found credible, including Brillinger's need to alternate frequently between sitting and standing. Plaintiff's testimony is insufficient to establish any additional limitations. The ALJ's findings regarding plaintiff's credibility are substantially supported by the evidence, including the opinions

of her treating physicians and the opinions of a consultative examiner, Dr. Catherine DiGiorgio. (Tr. 334-35).

Plaintiff contends that Dr. DiGiorgio's opinions should be discounted relative to other record evidence from an emergency room physician and John B. Logan, M.D., an orthopedic surgeon, because Dr. DiGiorgio is a dermatologist, according to information that plaintiff found on a third-party website (i.e., not the website of Dr. DiGiorgio or her employer) and printed on October 23, 2014. Plaintiff's memorandum, Record Doc. No. 14-2 at p. 8. Brillinger cites no law to support her contention. She identifies no errors in Dr. DiGiorgio's examination. Dr. DiGiorgio's report was in the record for almost 10 months before the hearing date. Plaintiff was represented by an attorney during the hearing, but did not question Dr. DiGiorgio's qualifications. Nothing in the record indicates that Dr. DiGiorgio was not qualified to render medical opinions or that the ALJ knew or should have known that Dr. DiGiorgio was a dermatologist, if she was a dermatologist when she examined Brillinger on April 10, 2012, more than two years before plaintiff's Internet search for the doctor's speciality.

Dr. DiGiorgio's report indicates that she is a doctor and was working for Southern Louisiana Disability when the Commissioner requested a consultative examination from that organization. As requested, Dr. DiGiorgio performed a comprehensive physical examination with history and rendered a report that addressed plaintiff's allegations of severe migraines, skin disorder, anxiety and fibromyalgia; described Brillinger's gait,

range of motion, spasms, neurological defects and atrophy in the affected areas; and commented on plaintiff's understanding, cooperation, ability to concentrate and maintain attention, restriction of daily activities and social interaction. (Tr. 333-34). Anthony Scardino, M.D., an internist who reviewed Brillinger's medical records and opined that she could perform basically the full range of light work, which led to the initial denial of plaintiff's applications for disability, relied on Dr. DiGiorgio's findings without questioning her qualifications.

Finally, if the court is to look outside the record to Internet sources on this issue as plaintiff requests, the American Board of Dermatology's website states that candidates for certification must complete a first-year residency in emergency medicine, family medicine, general surgery, internal medicine, obstetrics and gynecology, or pediatrics, followed by three years of dermatology residency.[9] Thus, it appears that a dermatologist is a medical doctor qualified to perform a comprehensive physical examination. It is the ALJ's responsibility to weigh the medical evidence and determine a claimant's disability status, and he is not required to attribute greater credibility to the opinions of treating physicians than to that of a consultative examiner. Huskey v. Colvin, 560 F. App'x 367, 370 (5th Cir. 2014) (citing Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990)); Byrd v. Comm'r of Social Sec., 368 F. App'x 542, 543 (5th Cir. 2010) (citing Perez, 415 F.3d

---

[9]The American Board of Dermatology, Inc., http://www.abderm.org/residency/residency.html (visited Feb. 19, 2015).

at 461); Escalante v. Astrue, 286 F. App'x 179, 180 (5th Cir. 2008) (citing Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Moore, 919 F.2d at 905).  In this case, as the following review of plaintiff's medical records reflects, Dr. DiGiorgio's report is not substantially contradicted by any other physician, and the ALJ was entitled to consider and rely upon her findings, along with the other medical evidence that he cited.

Brillinger relies heavily on the results of an MRI of her lumbar spine taken on September 11, 2012, to try to bolster her credibility.  (Tr. 349-50).  However, the ALJ noted those MRI results and found that plaintiff has a severe impairment of degenerative disc disease of the lumbar spine.  The ALJ credited her testimony to the extent it correlated with the MRI.  However, as the ALJ described in detail, the remainder of the medical records did not substantially support plaintiff's allegation that, functionally, she must recline and elevate her legs for six to seven hours per day.

The medical records span from July 19, 2011 to March 25, 2013.  Brillinger complained of chronic lower back and hip pain in the second half of 2011.  She was successfully treated with physical therapy to increase her range of motion and reduce her pain level.  (Tr. 225-26, 254-57, 291, 304).  On August 8, 2011, she had a normal sacroiliac joint x-ray and x-rays of her lumbar spine that showed degenerative disc disease at L5-S1.  (Tr. 307-08).

Plaintiff's treating internist, Dr. Hebert, referred her to rheumatologist Marielisa Sedrish, M.D., who initially diagnosed fibromyalgia.  After an extensive work-up, Dr.

Sedrish on January 5, 2012, diagnosed undifferentiated connective tissue disease. Brillinger was started on Plaquenil[10] and advised to return in three months (Tr. 221). Plaintiff told Dr. DiGiorgio on April 10, 2012, that she took nothing for fibromyalgia or whatever condition her treating physicians currently thought she had, and she testified to the same effect at the administrative hearing ten months later.

Brillinger was seen in the LSU Bogalusa Medical Center emergency room on January 13, 2012, complaining of a back injury two days earlier. X-rays of her lumbar spine showed moderate degenerative joint disease at L4-5 and L5-S1. She had tenderness and muscle spasm in her lumbar region on physical examination. She was diagnosed with lumbar strain. (Tr. 258, 316).

Brillinger's medical treatment in February and March 2012 focused on abdominal issues, which resolved after a few months. An MRI of her pelvis taken on April 10, 2012, found no abnormalities. (Tr. 360).

On April 10, 2012, Dr. DiGiorgio performed a thorough physical examination and found no abnormalities, other than obesity. The examination revealed that Brillinger had normal muscle strength, muscle tone, sensation, pulses, range of motion, gait, station and ability to grasp, handle and finger objects. She walked on her heels, toes and tandem,

---

[10]Plaquenil (generic name: hydroxychloroquine) is used to treat the swelling, inflammation, stiffness and joint pain of rheumatoid arthritis, and is also prescribed for lupus erythematosus, a chronic connective tissue inflammatory disorder. PDRhealth, http://www.pdrhealth.com/drugs/plaquenil (visited Feb. 11, 2015).

and could push, pull, reach, crouch and squat, without difficulty, pain or spasms.  Dr. DiGiorgio noted no restrictions in plaintiff's daily activities or social interaction.  (Tr. 334-37).

On April 20, 2012, Dr. Scardino reviewed plaintiff's medical records and opined that she was capable of essentially the full range of light work, with minor restrictions on climbing and exposure to temperature extremes.  (Tr. 76-78, 342).  The ALJ assigned little weight to Dr. Scardino's residual functional capacity assessment and more weight to Brillinger's own testimony about her limitations in sitting and standing, to the extent the testimony was consistent with the objective evidence.  Nonetheless, Dr. Scardino's opinion supports the ALJ's finding that Brillinger can perform some range of sedentary work, which by definition is less strenuous than light work.  20 C.F.R. § 416.967(b).

At a followup visit for esophagitis, gastric ulcer and duodenitis on May 23, 2012 at LSU Bogalusa Medical Center's outpatient clinic, plaintiff's physical examination was essentially normal, with specific notations of normal limbs in appearance and function, normal peripheral pulses, no edema,[11] no sensory or motor loss and symmetrical deep tendon reflexes.  (Tr. 358).

At a visit to Lallie Kemp Hospital emergency room on July 13, 2012, Brillinger complained of pain radiating from her lower back into her left hip and down her legs

---

[11]Edema is an abnormal excess accumulation of serous fluid in connective tissue or a serous cavity.  MedlinePlus Medical Dictionary (Merriam-Webster, Inc. 2015), http://www.merriam-webster.com/medlineplus/edema (visited Feb. 19, 2015).

bilaterally.  She had decreased lumbar range of motion and muscle spasm.  She stated that she had not previously had similar symptoms.  She was diagnosed with sciatica (Tr. 403-06), the first time such a diagnosis was made.

When plaintiff presented as a new patient at Ochsner Family Medicine clinic on July 17, 2012, she complained of left hip pain not relieved by the medications she had received at the emergency room four days earlier.  Physical examination revealed that she was tender in her left paravertebral area, had decreased lumbar range of motion and had a positive, left-sided straight leg raising test that reproduced sciatic pain, but had normal range of motion in her neck and normal reflexes.  Gurpal S. Benning, M.D., diagnosed left-sided sciatica.  (Tr. 388-89).

At a follow-up visit at LSU Bogalusa Medical Center for her abdominal problems on August 20, 2012, Brillinger did not complain of any pain.  It was noted that she was followed by the Rheumatology Clinic for a positive ANA and joint pain, and that she was not taking her prescribed Amaryl.[12]  She was advised to resume taking it.  Physical examination of her limbs and neurological signs were normal.  (Tr. 355-56).

---

[12]Amaryl (generic name:  glimepiride) is used to help control high blood sugar in adults with type 2 diabetes.  PDRhealth (PDR Network, LLC), http://www.pdrhealth.com/drugs/amaryl (visited Feb. 11, 2015).

Plaintiff complained of left hip and low back pain radiating down her left leg with paresthesias[13] when she saw Dr. Hebert on September 4, 2012. No physical examination was performed. Dr. Hebert noted that Brillinger was doing better since taking Amaryl, and he ordered an MRI of her lumbosacral spine. (Tr. 351-52).

The MRI on September 11, 2012, showed a large disc extrusion to the left of midline at L4-L5 that results in essentially complete obliteration of the spinal canal and severe compression of the cauda equina nerve roots.[14] The MRI also demonstrated moderate disc space narrowing, mild desiccated disc bulging and a shallow disc protrusion at L5-S1 that contacts the descending right S1 nerve root. (Tr. 349-50).

On September 12, 2012, Brillinger was seen by Jen Karen Erbil, M.D., at Interim LSU Public Hospital's Rheumatology Clinic. Dr. Erbil observed that plaintiff had been worked up thoroughly after her positive ANA result, but met no criteria for systemic lupus erythematosus. Dr. Erbil stated that Brillinger was worked up at her last visit for possible spondyloarthropathy[15] based on complaints of morning stiffness, back pain radiating down both legs and left hip pain. Dr. Erbil had not yet seen the previous day's MRI results. Physical examination revealed multiple trigger points tender to palpation.

---

[13]Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." Dorland's at 1324.

[14]The cauda equina is the collection of spinal roots at the lower part of the spinal cord. Id. at 300.

[15]Spondyloarthopathy is any of several diseases affecting the joints of the spine. MedlinePlus, http://www.merriam-webster.com/medlineplus/spondyloarthropathy (visited Feb. 19, 2015).

Plaintiff had no edema and had normal reflexes and range of motion in all joints, her neck and back.  Dr. Erbil concluded that work-up for spondyloarthropathy was negative and that no diagnosis could be found beyond the previous ones of positive ANA and fibromyalgia.  The doctor recommended that Brillinger follow up with her primary care provider regarding her lower back pain and MRI results, and return to the Rheumatology Clinic in six months.  (Tr. 363-65).

Plaintiff went to the LSU Bogalusa Medical Center emergency room for sinusitis on December 12, 2012.  Physical examination of her neck was normal and she had normal range of motion, motor strength and sensation in all extremities.  (Tr. 374-75).

Brillinger was examined by Dr. Logan, an orthopedic surgeon, on February 27, 2013, at her own request.  Dr. Logan's report is Exhibit B14F, which the ALJ failed to consider in his original decision, but which did not change his findings upon reconsideration.  Plaintiff presented with a two-year history of neck pain, which she said she had been told was arthritic.  Dr. Logan's review of systems notes that Brillinger complained of frequent pain in her neck, shoulder blades and both arms and hands with bilateral loss of dexterity.  (Tr. 392-93).  This history is not substantially supported by the medical records, which reflect only two complaints of neck stiffness or pain on July 19, 2011 and January 5, 2012 (Tr. 221, 226), no tests for or diagnosis of cervical arthritis and no prior complaints of upper extremity pain or loss of dexterity.

Brillinger's primary complaint to Dr. Logan was of continuous low back pain, burning pain in both buttocks radiating down both legs, and numbness and tingling in both feet.  She said the pain woke her at night.  She reported that it was relieved by medication, standing, sitting and heat, and was worsened with walking, running, driving and either sitting or standing for long periods of time.  Plaintiff told Dr. Logan that she had gone to physical therapy for six weeks two years ago, which had helped, but that the pain came back after the therapy was finished.  She stated that she had not had any other treatment since the physical therapy.  She felt that heat, ice and exercise did not help her pain and wanted to discuss other options.  (Tr. 391).

Dr. Logan noted that Brillinger reported that her pain radiating into her <u>right</u> leg was more significant than in her left, which is opposite from the remainder of the medical records when this type of comparison was made.  Dr. Logan reviewed the September 11, 2012 MRI of Brillinger's lumbar spine and noted that it showed "a significant disc herniation at L4-5 with a bit of degradative changes at the L5-S1 level."  (Tr. 394).  Physical examination revealed that plaintiff stood erect with a mild forward list, had pain on palpation of the lumbar musculature and had a diminished lumbar range of  motion.  She was "able to raise up on her heels and toes with reassurance."  (Tr. 394-95).  She had grossly normal muscle strength in both legs and hips with trace patellar and Achilles reflexes.  Straight leg raising test was positive for back and thigh pain bilaterally.  Dr. Logan again described the MRI results, stating that the test "shows a rather massive disc

herniation at the L4-5 level central with a left-sided bias[,] . . . a bit of a protrusion at L5-S1 level  as well and has obvious two level degradative changes L4-5 and L5-S1."  He told Brillinger that she was a likely candidate for "decompression versus decompression and fusion surgery" and that he would refer her to another doctor at LSU to handle her case.  Dr. Logan diagnosed back pain, lumbar spondylosis[16] and lumbar degenerative disc disease.  (Tr. 395).

On March 25, 2013, plaintiff saw Jayme Trahan, M.D., of Interim LSU Public Hospital's neurosurgery department.  Dr. Trahan noted Brillinger's one- to two-year history of lower back pain with bilateral radiculopathy,[17] leg pain greater than back pain and left leg pain greater than right.  He stated that plaintiff's lumbar MRI revealed a very large L4-5 disc herniation with severe canal compromise.  Dr. Trahan planned to perform a discectomy.  (Tr. 413).

The entirety of the medical records substantially supports the ALJ's evaluation of plaintiff's credibility for the reasons that he stated.  Brillinger had relatively infrequent and conservative medical treatment for her back and leg problems until February 27, 2013, more than one year after her alleged onset date.  Before the September 11, 2012,

---

[16]Spondylosis is "[a]nkylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature."  Stedmans Medical Dictionary (on Westlaw at STEDMANS 840410). Ankylosis is "[s]tiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint."  Id. at STEDMANS 23900.

[17]Radiculopathy is "any pathological condition of the nerve roots."  MedlinePlus, http://www.merriam-webster.com/medlineplus/radiculopathy (visited Feb. 19, 2015).

MRI of her lumbar spine, there was a lack of objective studies to correlate clinically with the alleged heaviness and reduced strength in her legs, including a negative MRI of her pelvis, a normal sacroiliac joint x-ray and x-rays of her lumbar spine in August 2011 and January 2012 that did not show severe degenerative disc disease. Although she had positive straight leg raising tests on July 17, 2012, and February 27, 2013, Brillinger had essentially normal findings on physical examinations in April, May, August, September and December 2012. Her lack of need to take any medication for fibromyalgia, which she alleged as a disabling problem in her applications for benefits, and the lack of any physician's restriction to lie down with her feet elevated for six to seven hours are substantially supported by the medical evidence. To the extent that Dr. Logan's report on February 27, 2013, appears to document some new or increased symptoms of back and neck pain and recommends surgery for the first time, the report may reflect deterioration of a condition that was not previously disabling and that may be the basis for a new application for benefits. Joubert v. Astrue, 287 F. App'x 380, 383 (5th Cir. 2008); Leggett v. Chater, 67 F.3d 558, 567 (5th Cir. 1995).

This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." Newton, 209 F.3d at 452. "The ALJ found the medical evidence more persuasive than the claimant's own testimony. These are precisely the kinds of determinations that the ALJ is best positioned to make." Falco, 27 F.3d at 164.

Substantial evidence in the record supports the final decision of the Commissioner as trier of fact.  Accordingly, plaintiff's assignment of error lacks merit.

CONCLUSION

Substantial evidence supports the ALJ's finding that plaintiff's allegations regarding her need to lie down for six to seven hours per day with her feet elevated are not credible.

**RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v.</u>

United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[18]

New Orleans, Louisiana, this ___2nd___ day of March, 2015.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

_____

[18]Douglass referred to the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.